**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 5:26-CR-00022-KKC-MAS** |
| | ) | |
| **ASHLEY TAI ANDERSON,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

Defendant Ashley Anderson ("Anderson") came before the undersigned for an initial appearance on February 23, 2026. [DE 15]. The United States moved to detain Anderson, and the Court conducted a detention hearing. Considering the record—including testimony, proffer, the Pretrial Services Report ("PSR"), and arguments—the Court finds that Anderson must be detained in accordance with the Bail Reform Act ("BRA") and shall grant the United States' motion for detention.

## I.    ANALYSIS

Anderson is charged with three counts of aiding and abetting in an attempt to employ, use, persuade, induce, or coerce a minor to engage in sexually explicit conduct for the purpose of producing visual depictions of that conduct, in violation of 18 U.S.C. § 2251(a), and one count of knowingly possessing matter containing visual depictions, the production of which involved the use of a minor engaging in sexually explicit

conduct and the visual depictions were of such conduct, in violation of 18 U.S.C. § 2251(a)(4)(B). [DE 1]. At the initial appearance, the United States orally moved for pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(E). [DE 7]. The Court conducted a detention hearing on March 10, 2026. [DE 20]. At the detention hearing, various exhibits and the testimony of five witnesses were provided by the parties. [DE 21]. The witnesses included Officer Chad Moss ("Moss"), United States Probation Officer; Walker Kelsey ("Kelsey"), a friend of Anderson; Britney Ragland ("Ragland"), co-leader of the Celebrate Recovery program; Lucinda Purvis ("Purvis"), Anderson's aunt; and Federal Bureau of Investigation Task Force Officer Stanley Williams ("Williams").

## A.    LEGAL STANDARD FOR DETENTION UNDER THE BAIL REFORM ACT

The Court afforded both sides all procedural rights outlined in the Bail Reform Act. The BRA levies a presumption of detention as to both nonappearance and danger risk due to the charges in this case. 18 U.S.C. § 3142(e)(3)(E). The BRA and *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010), frame the resulting inquiry. The presumption imposes on the defendant a threshold "burden of production"; in response, "he must introduce at least some evidence" that he poses neither a flight nor a danger risk. *Stone*, 608 F.3d at 945; *see also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (imposing a responsive burden on the defendant to produce "some evidence that he will not flee or endanger the community if released"); *United States v. Hernandez*, No. 1:02-CR-006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (requiring the defendant to "produc[e] probative, credible evidence to

rebut the presumption and support his contention that he will appear . . . and [that] he does not pose a danger"). The production burden "is not heavy," and the Government retains the ultimate burden of persuasion. *Stone*, 608 F.3d at 945. An unrebutted presumption requires detention. A rebutted presumption remains a pro-detention statutory factor. *See id.* ("The presumption remains as a factor because it . . . reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

Where a defendant rebuts the presumption, the burden shifts back to the United States. Detention premised on nonappearance must rest on facts supported by a preponderance of the evidence. *See, e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Curry*, No. 6:06-CR-82-DCR, 2006 WL 2037406, at *6 (E.D. Ky. July 18, 2006). Detention based on danger, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure the safety of the community. 18 U.S.C. § 3142(f). Further, almost any conditional release ultimately depends on a court's assessment of a defendant's good faith intentions and predicted compliance with any imposed conditions. *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) (evaluating predicted good faith compliance as a critical release component).

Evidence rules do not apply in the detention hearing context. 18 U.S.C. § 3142(f). The hearing is informal, and the Court may consider a wide range of proof, weighing the evidentiary reliability and accuracy. *See, e.g.*, *United States v. Webb*, 149 F.3d 1185 (Table), No. 98-1291, 1998 WL 381686, at *1

(6th Cir. June 22, 1998). However, the nature and quality of proof impact its probative value and weight in the detention calculus. The § 3142(g) factors guide the analysis.

**B.    APPLICATION OF THE PRESUMPTION**

To rebut the presumption as to flight or nonappearance and danger, Anderson relied predominantly on information from the PSR and testimony of Ragland and Kelsey. Anderson clearly has some familial support, strong community ties, and has become an integral part of a local recovery support group and church. All evidence suggests that Anderson is sober and no longer uses controlled substances. Additionally, she has dedicated considerable time and effort to creating her own landscaping business, which she has operated for the last three years. As to her state charges, Anderson was released on a cash bond in the related state case and there is no evidence that Anderson committed any further crimes since her release.

On balance, the Court finds that these considerations are sufficient to meet Anderson's low production burden, overcoming the detention presumption as to danger and nonappearance. *See Stone*, 608 F.3d at 945; *see also United States v. Hernandez*, No. 1:02-CR-006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002) (requiring "probative, credible evidence to rebut the presumption"). However, "[t]he presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" *United States v. Lattner*, 23 F. App'x 363, 364 (6th Cir. 2001) (citing *United States v. Martir*, F.2d

1141, 1144 (2d Cir. 1986)). As such, the presumption will remain a pro-detention consideration in both the nonappearance and danger contexts. *Stone*, 608 F.3d at 945.

## C.   ANDERSON'S DANGER TO THE COMMUNITY

In analyzing Anderson's potential for danger to the community, the Court considers her history and characteristics, the nature and circumstances of the offense charged, the weight of the evidence against Anderson, and the nature and seriousness of the danger to any person or the community that would be posed by her release. *See* 18 U.S.C. § 3142(g). Under the BRA framework, the United States has proven by clear and convincing evidence that Anderson poses a danger to the community.

### 1.   Anderson's History and Characteristics

The Court must consider many aspects of Anderson's background in making the decision to release or detain her. Specifically, the BRA requires courts to "take into account the available information concerning— [ . . . ] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation[.]" 18 U.S.C. § 3142(g)(3).

Anderson was born in Morehead, Kentucky, and has spent much of her life in this district. [PSR at 1–2]. Her parents, Teresa and Floyd, divorced when she was approximately eleven years old. Both parents currently reside in Owingsville, Kentucky. [PSR at 2]. Anderson has three siblings, Carey Anderson and David and

Emily Chandler.  Carey and Emily also reside in Owingsville, while David resides in Beattyville, Kentucky.  Anderson has a twelve-year-old son, who resides with her father and stepmother, and seven-year-old twins, who are currently in her mother's custody.  Anderson's co-defendant, Bruce Mitchell, is the biological father of the twins.  Anderson has been prohibited from having any contact with her children or parents since October 2020.  Anderson currently resides alone in Lexington, Kentucky.  If released, Purvis indicated that she may reside with her cousin (the son of Lucinda Purvis) and his wife in Waco, Kentucky.

Anderson is thirty-nine years old.  [PSR at 1].  She attended Bath County High School before withdrawing in the twelfth grade.  [PSR at 2].  Anderson reports earning her high school diploma in 2007, from an online program through Sullivan University.  Prior to her arrest on federal charges, Anderson was self-employed.  [PSR at 1].  She began a landscaping business, Bluegrass Faith Landscaping, over three years ago.  As previously stated, it appears that Anderson has put significant effort into building her business, including retrofitting an old truck to serve as a snowplow to extend her offerings to snow removal.  She also works as a landscaper on an as-needed basis for Triple D Landscaping.  [PSR at 3].

Anderson reports being in good physical and mental health.  [PSR at 4].  The information in the PSR and evidence presented at the detention hearing indicate that Anderson has a history of substance use disorder.  Specifically, Anderson reported weekly use of alcohol, daily use of cannabinoids, and occasional use of prescription opiates (Lortab and Percocet) until her state arrest six years ago.  Additionally,

Anderson explained that she used heroin/fentanyl and methamphetamines daily for a one-week period in late September 2020. This was during the time the alleged events underlying the Indictment occurred. From November 2021 to August 2022, Anderson participated in an Intensive Outpatient Treatment Program in Lexington, Kentucky. Furthermore, she currently attends Narcotics Anonymous/Alcoholics Anonymous meetings and leads group Celebrate Recovery sessions at Man 'O' War Church in Lexington. All facts within the purview of this Court indicate that Anderson has been sober for the last four and a half years, since her release on bond.

Anderson's criminal history is relatively *de minimis*. In 2006, at the age of nineteen, she was convicted of Operating a Motor Vehicle Under the Influence of Alcohol/Drugs. [PSR at 5]. Then, in 2013, Anderson received a conviction for Buying/Possessing Drug Paraphernalia. Her most recent criminal activity occurred in August 2020, when she was convicted of Theft by Unlawful Taking or Disposition/Shoplifting Under $500. This lack of substantial criminal activity certainly weighs in Anderson's favor in the detention consideration.

In early October 2020, Anderson and her co-defendant, Bruce Mitchell, were arrested on the related state offense. On November 19, 2021, Anderson was released on a $20,000 cash bond with the following conditions: home detention with electronic monitoring, to be at home or treatment only, no contact with the victims, and no further violations of the law. [PSR at 6]. The conditions of Anderson's release have been modified twice to allow her to work and attend church and NA/AA meetings. The information in the PSR indicates that, upon being provided access to Anderson's

electronic monitoring history since August 2025, Officer Moss learned that Anderson's movement history was inconsistent with her home detention conditions. Specifically, GPS points indicated that, since December 2025, Anderson frequently visited an individual named Christian Warta ("Warta") at times inconsistent with performing duties related to her landscaping business or attending church and NA/AA meetings.

At the detention hearing, Anderson countered that Warta's home was on the most convenient route from her home to Winchester Road, which may account for some of the GPS pings. However, Moss explained that the GPS records show over twenty instances in which Anderson remained at Warta's home for more than forty-five minutes, which cannot be accounted for by her argument.

To account for some visits, Anderson averred that she recently expanded her landscaping business to include snow removal services. To do so, Anderson's truck needed to be repaired and retrofitted with a snowplow. Walker Kelsey, an individual Anderson and Warta met in NA/AA, had past experience as a vehicle mechanic and worked on Anderson's truck at Warta's residence. Kelsey testified that Warta's residence was chosen as the location for the work because he had a garage for the truck.[1] Kelsey provided testimony that on several occasions in January 2026, he met Anderson at Warta's residence to work on the truck. On January 26, 2026, at 10:43 p.m., Kelsey completed the work on Anderson's truck. It is not for this Court to

---

[1] Anderson also produced a 1099 tax form which demonstrated that Warta was employed by Anderson's landscaping business, Bluegrass Faith, in 2025.

determine whether working on the truck falls within the state court's conditions of release; however, the Court accepts Anderson's explanation for her location on *some* occasions.

The problem remains that the truck work cannot possibly account for *all* her time at Warta's residence. In fact, there were several instances for which Anderson did not provide an explanation. For example, Anderson's location pinged at Warta's residence on February 14, 2026, at around 10:00 p.m. At some point in the evening, the call center[2] responsible for monitoring Anderson's location called her cell phone to inquire about her location. Anderson answered the phone and told the operator that she was at home.[3] Her location remained at Warta's residence until approximately 1:30 a.m. on February 15, 2026. Anderson's apparent lie to the call center operator, and inability to explain why her location was at Warta's residence at hours unsuitable for landscaping, lead this Court to the conclusion that Anderson was in violation of the conditions of her home detention.

Moreover, Moss testified that on multiple occasions Anderson's location was far from Lexington—and even outside this district—late at night without a reasonable explanation, including trips to Louisville, Bowling Green, Glasgow, Beattyville, and Owensville. Although Anderson's counsel suggested she may have

---

[2] Based on Moss's testimony, it appears that the Fayette County Detention Center employs a call center to review GPS coordinates.

[3] Moss noted that there was no further information in the electronic monitoring records about what transpired during the phone call.

been traveling to those locations for work, there was no evidence, testimony, or proffer to support that claim.

Finally, Wesley testified that he dined out with both Anderson and Warta. All of these activities were in violation of Anderson's bond conditions.

Unfortunately, Anderson's inability to comply with state bond conditions was not limited to the home detention arena. As previously stated, one of the conditions of Anderson's release was to cease all contact with the victims of the alleged crime. Likewise, a family court judge from the 22nd Circuit barred Anderson from contacting any of her three children until their eighteenth birthday or further order of the court. Still, the minor victim reported Lucinda Purvis bringing him food and giving him a message from Anderson in December 2022.[4] Additionally, just last year, Purvis and Anderson's brother delivered gifts from Anderson to the children on Christmas. Although these two instances certainly toe the line between adherence and violation, for this Court's purposes, indirect contact is still prohibited. In sum, the facts introduced are extraordinarily suggestive of multiple bond violations perpetrated by Anderson. And her violation of the Family Court's Order shows a concerning indifference to the authority of the courts.

Similarly, Purvis indicated that Warta had a spare key to Anderson's home and discussed paying Anderson's rent and utility bills following her federal arrest. Although the exact nature of the relationship between Anderson and Warta is

---

[4] Purvis disputes this and states that she only brough the child food; however, this Court believes that Purvis is less than credible, which will be discussed later.

contested—whether romantic or friendly—it is evident the two had a very close relationship. And that is what matters to this Court. Warta's history consists of three instances of sexual misconduct, two of which resulted in convictions. A 2013 conviction involved the anal penetration of a person who could not consent. Another involved the forceful vaginal penetration and oral sexual acts with minor he met on the Internet.[5] The United States presented evidence at the detention hearing demonstrating that Anderson was aware that Warta was a registered sex offender.[6] Further, the United States presented a December 2025 jail call between Anderson and Bayne, where Anderson stated that Warta kept "putting [her] in situations" and Bayne replied, "If you keep going to the barbershop, you gonna end up with a haircut." Although the exact nature of the conversation is unclear, when viewed in the context of Warta's criminal background and Anderson's knowledge of it, the conversation certainly causes the Court concern.

Even more so, the Court is generally concerned with Anderson's relationship with Warta and the extreme lack of judgment it demonstrates. Forming a close relationship with any registered sex offender while facing both state and federal charges related to the production of child sex abuse material is questionable. It is even more questionable considering the nature of Warta's convictions (sodomy) closely align with the acts allegedly performed on the minor victim by Anderson and

---

[5] TFO Williams also testified that the minor victim was also put in the trunk of Warta's vehicle.

[6] The United States presented a video in which Christopher Bayne, a friend of Anderson's, discussed Anderson's awareness of Warta's status with another individual.

her then-boyfriend, Mitchell.  Moreover, Anderson's and Purvis's conduct following Anderson's recent arrest on federal charges indicates that they were aware of how the Anderson-Warta relationship would appear to others.  The United States presented testimony that, on February 27, 2026, Purvis asked Warta to remove any photographs of him and Anderson from his Facebook page and instructed him to stay out of the "mix."  Later, during a recorded jail call, Warta relayed Purvis's request to Anderson.  That communication marked the last recorded contact between Anderson and Warta.  Notably, prior to Purvis's intervention, Anderson and Warta communicated multiple times per day after her arrest.

Purvis's conduct is independently concerning. She described herself as very close to Anderson and stated that they communicate regularly.  She also maintains regular contact with Mitchell.  During her testimony at the detention hearing, Purvis made several statements regarding Anderson and events following her arrest; however, when challenged by the United States, she frequently claimed not to recall those events.  Purvis also reportedly told Officer Moss that she had never met Warta. At the hearing, she acknowledged that she had, in fact, met Warta, though she could not identify where.

The record further suggests that Purvis has repeatedly attempted to assist Anderson in concealing her activities.  For example, following her arrest, Anderson asked Purvis to contact individuals who might be looking for her, including Warta, and Purvis complied.  Although Purvis denied doing so, the United States presented evidence that she contacted Warta and asked him to take steps to conceal his

relationship with Anderson.  The United States also introduced evidence indicating that Purvis helped facilitate communication between Anderson and the minor victim, despite her denial of that fact.  While a supportive family is often a positive factor, Purvis's actions demonstrate a willingness to assist Anderson in concealing misconduct and to obscure evidence of that assistance. Thus, Purvis's conduct must weigh against Anderson in this analysis.

Altogether, Anderson's history and characteristics do not present a compelling case for release.  Indeed, there are factors which weigh in her favor: Anderson has extensively worked to create and build her landscaping business; she has some familial and community support, as demonstrated by the testimonies of Ragland, Kelsey, and Purvis; she has been sober since her 2021 release in the related state case; and she has a relatively insignificant criminal history.  What the Court cannot ignore, however, is Anderson's behavior following her release.  She has continuously, and recently, violated the conditions of her bond.  She has contacted her children in violation of the conditions of her release and the order of another court.  Perhaps, most concerningly, Anderson has chosen to closely associate with a registered sex offender who was convicted of similar crimes to those alleged here—and, sought to hide that relationship after her February 2026 arrest on the federal charges.  In sum, these actions and events demonstrate a complete lack of judgment, respect for the authority of various courts, and understanding of the serious nature of the crimes of which she is accused.  For these reasons, this factor heavily favors detention.

## 2.    The Nature and Circumstances of the Offense Charged

The next BRA factor is the "nature and circumstances of the offense charged." 18 U.S.C. § 3142(g)(1).  The alleged offenses in this case are among a category of offenses that Congress has deemed particularly dangerous and typically appropriate for pretrial detention.  Though Anderson rebutted the presumption, it remains a pro-detention consideration in both the flight and danger contexts.  *Stone*, 608 F.3d at 945.  The alleged offense circumstances here are extremely dangerous.  *See United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003) (observing that "[d]etaining adults who prey on children for the adult's sexual gratification . . . is [ ] a legitimate government objective" justifying pretrial detention).  At the detention hearing, the United States offered proffer and proof of Anderson's alleged criminal conduct, mainly through the testimony of Federal Bureau of Investigation Crimes Against Children Task Force Officer Stanley Williams and video evidence of the alleged conduct.

TFO Williams testified that on October 4, 2020, Lexington Police Department dispatch received a call from St. Claire Regional Medical Center in Morehead, Kentucky, about a minor victim ("MV") with injuries consistent with abuse.  This call sparked additional investigation which revealed that the seven-year-old MV was brought into the hospital by his maternal grandfather, Floyd Anderson ("Floyd"), who noticed the injuries after retrieving the child from his daughter, Ashley Anderson.

Specifically, in the days before the hospital visit, Anderson and Mitchell were moving from Anderson's mother's home in Morehead, Kentucky, to Anderson's home in Lexington, Kentucky.  This involved staying in a series of different hotels and

Anderson's Lexington home. Throughout the move, Floyd had regular contact with Anderson, who allegedly told Floyd that MV was sticking large objects in his rectum and trying to kill Anderson, Mitchell, and their twin babies by putting feces in their food. On October 4, Floyd met Anderson to pick up MV. When he arrived, MV was partially nude, covered in feces, and sitting in the van on a plastic pan. Floyd immediately took MV home to clean him up and upon seeing his injuries, proceeded to St. Claire for treatment. Floyd reported that MV had black eyes, busted blood vessels, and bruising all over his body.

Officers from the Lexington Police Department were able to interview Anderson and Mitchell later that same day. Throughout the interview, both adults denied any instance of abuse. Anderson seemed to produce a flurry of reasons for the child's condition. She alleged that MV was acting out and repeated the previous accusations that he was sticking objects up his rectum and putting feces in their food. She added that, at one point, MV stole the family's Tahoe and was driving it around the parking lot of the hospital. After further interviews and investigation, law enforcement officers were unable to corroborate any of Anderson's statements. As for MV's physical condition, Anderson claimed that some of the injuries were caused by a fall and the rest were self-inflicted. TFO Williams testified that MV's injuries were not consistent with either of those stories.

At some point during the interview, Anderson began to show detectives videos on her phone, which she claimed were taken to document MV's behavior and show

everyone what he was doing.[7]   However, TFO Williams testified that the videos do not depict any of the alleged behavior described by Anderson.  Instead, the nature of the videos prompted detectives to seize Anderson's phone.

According to Williams, the seizure of Anderson's phone led to the discovery of many videos documenting various forms of abuse of MV from September 30, 2020, to October 4, 2020.  At the detention hearing, the United States presented only four shortened clips of the videos from Anderson's phone to exemplify the criminal actions allegedly taken by Anderson; however, TFO Williams testified as to the contents of the remaining videos.  Anderson appears to be the videographer in each of the following videos.

The four videos placed into evidence, without going into graphic detail, demonstrate several things: (1) MV has swelling around one eye, two black eyes, and an alarming number of bruises on every inch of his body (by this Court's estimate, the bruises appeared to be quarter-sized and were located approximately one inch apart on all visible parts of MV's body); (2) constant and repeated verbal abuse of MV, including Anderson states that she does not know how she has not killed MV yet; (3) videos of MV completely naked with his anus and genitalia exposed; (4)  physical abuse where MV is being pinned down with his arms held behind his back; and (5) MV with bound hands being told to keep his hands above his head.

---

[7] Notably, Anderson's parents, whom she specifically said she wanted to show the videos to, do not recall Anderson ever showing them the videos.

According to TFO Williams, the remaining videos depict Mitchell and Anderson hitting and kicking MV in the face and body, binding his arms with duct tape or rope,[8] strangling him, digitally penetrating his anus, penetrating his anus with multiple different objects, and performing medically unnecessary enemas on him. Williams testified that Anderson and Mitchell indicated in the videos that they were trying to locate an object that they believed was in MV's anus. They did this by continuously penetrating MV's anus with other objects and their fingers. Throughout the videos, both Anderson and Mitchell threatened MV and used degrading language against him. MV was nude during most of the videos and there were several close-up and focused depictions of his genitals and anus. On multiple occasions, MV pled with them to stop and begged them to take him to the hospital, but Anderson and Mitchell refused him every time, mocking his pleas and calling him "stupid." Williams testified that MV described various other acts that were not shown in the videos, including that Mitchell gave him a "swirly," Mitchell put his entire hand in the child's anal cavity, and he was fed drugs. In an early interview, MV indicated that he would not tell the interviewer certain things due to a very "precious" pinky promise. Later, MV made additional disclosures to Floyd: he was forced to dig his own grave at Anderson's house, and he was told to perform oral sex on Anderson, while Mitchell stood behind him and penetrated his anus with an undisclosed object. Based on his training and experience, TFO Williams testified that there are

---

[8] MV was nude at all times that he was bound.

individuals who are sexually aroused by feces, enemas, anal penetration, anal gaping, and torture.

Williams also testified that body worn camera video and pictures taken by social workers depicted deplorable living conditions. Anderson's home was incredibly unclean, with food and other objects littering the floor. Furthermore, the United States produced evidence that MV's bedroom window was fitted with prison-style bars and a lock. No other point of egress sported similar mechanisms.

Following the alleged acts, both Mitchell and Anderson tested positive for methamphetamine. Analysis of a hair follicle sample revealed the presence of methamphetamine in the minor vehicle's system.

Adding to the concerns in the detention analysis, Anderson seemingly went to great lengths to conceal her involvement in the alleged crimes and fabricated excuses to do so. For instance, video evidence shows Anderson putting makeup on MV's face in a clear effort to conceal his bruises and blackened eyes. Moreover, TFO Williams testified that the child appeared to be coached on answers and reported "pinky promising" that he would never tell anyone about the events that transpired at his home. There is at least some indication that the purpose of Purvis's 2022 message to MV was to tell him that Anderson loves him and would never hurt him.

As previously stated, Anderson told her parents and law enforcement several different stories to explain the child's physical condition. More recently, in 2024, Anderson told psychologists that she was coerced and threatened by Mitchell. During her testimony, Purvis recounted a similar story, stating that the week was "hell on

earth" for Anderson and that Mitchell trapped her in a hotel room with the children, drugged her, and threatened her with a gun. However, this seems unlikely. To begin, Purvis has certainly proven to be a less than credible witness. Furthermore, there is no evidence that Anderson made any such claim to law enforcement or her parents immediately following her arrest. TFO Williams testified that there was no evidence of coercion in any of the videos. There were no guns present in the video, no threats of physical violence, and several instances in the videos where only Anderson was engaged in the abuse. Additionally, there is at least one video where Mitchell is clearly incapacitated and incapable of forcing any adult to do anything, much less abuse their own child.

The alleged acts underlying the Indictment in this matter are unbelievable and egregious. And, based on the evidence before the Court, Anderson's alleged involvement is substantial. The BRA manifestly signals Congress's belief in the inherent, exceptional dangerousness of the at-issue offense. And as previously discussed, the detention presumption stemming from it "does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class [of crimes].'" *United States v. Lattner*, 23 F. App'x 363, 364 (6th Cir. 2001) (quoting *United States v. Martir*, F.2d 1141, 1144 (2d Cir. 1986)). Sex offenses against minor victims are, in and of themselves, offenses that pose a serious danger to the community. *See United States v. Fitzhugh*, No. 16-MJ-30364, 2016 WL 4727480, at *5 (E.D. Mich., Sept. 12, 2016) ("*Just one* sexually-related offense against *just one*

minor is enough to imply dangerousness."); *United States v. Music*, No. 107-CR-21-R, 2007 WL 2067057 (W.D. Ky. July 16, 2007) (revoking an order releasing a defendant pending trial when defendant was guilty of an offense against a minor, but had no prior criminal history).   Thus, the presumption persists as a pro-detention consideration, and, overall, this factor heavily favors detention.

### 3.      **The Weight of the Evidence of Dangerousness**

In weighing the strength of the evidence, the district court may not modify or limit the defendant's presumption of innocence.  18 U.S.C. § 3142(g).  "[T]he § 3142(g) analysis is concerned with a practical assessment of the defendant's dangerousness, rather than an adjudication of guilt for a particular offense." *United States v. Tolbert*, No. 09-CR-56, 2017 WL 6003075, at \*5 (E.D. Tenn. Dec. 4, 2017) (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010)).

This factor is somewhat duplicative of § 3142(g)(1) and (3) because, in considering a defendant's overall dangerousness, the Court must consider the facts of the crime alleged as well as evidence that the defendant has been dangerous in the past, such as criminal history and a history of violent behavior.  Here, this factor weighs in favor of detention.

As discussed above, Anderson faces federal charges for an egregious crime. The evidence discovered certainly implies that she perpetrated sexual offenses against her minor child and produced videos of at least some of the alleged actions. And such crimes are certainly dangerous.  *See Fitzhugh*, 2016 WL 4727480, at \*5 ("*Just one* sexually-related offense against *just one* minor is enough to imply dangerousness.").   Further, Anderson's demonstrated inclination to conceal her

actions is concerning. This is especially true in light of Purvis's testimony and the United States' proffer demonstrating Anderson's successful attempts at contacting her children since her release on the related-state offense, including the minor victim of her alleged crimes. And Purvis's conduct in attempting to remove any connections between Anderson and Warta to avoid detection by others and then denying it under oath in front of this Court.

Moreover, Anderson's choice to engage in a close relationship with Warta, a registered sex offender convicted of crimes of a similar nature to those alleged here, demonstrates an extreme deficit in her judgment. More importantly, it raises this Court's level of concern in releasing Anderson as there is at least some indication that Warta was responsible for putting Anderson in situations that she did not want to be in. In this analysis, Mr. Bayne's statement comes to mind, "If you keep going to the barbershop, you gonna end up with a haircut." Perhaps Anderson is capable of resisting a "haircut," but her desire to return to the barbershop is certainly cause for concern.

In the end, Anderson has demonstrated that she does not care to violate Court conditions to do what she wants, including spending time with Warta, regardless of his own dangerousness. While Anderson's criminal history and other characteristics are consistent with a law-abiding citizen, Anderson's post-state release behavior is undoubtedly concerning and weighs heavily on the detention side of the scale. Balancing these competing considerations, the Court finds that there is some weight

to the evidence of Anderson's dangerousness sufficient to tip this factor towards detention.

### 4. The Nature and Seriousness of Danger Posed by Release

For the fourth and final factor under the BRA, the Court must weigh "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4). In cases involving child sex abuse materials, courts in this district have previously recognized the grave threat such conduct poses to the community. *See United States v. Kinison*, No. 5:12-CR-57-JBC-REW, 2012 WL 4433296, at *4 (E.D. Ky. Sept. 24, 2012) (finding substantial danger risk where evidence demonstrated that the defendant had "a plain, prurient interest in children" and had been handling child exploitation materials).

Anderson is charged with conduct that occurred in one week, nearly six years ago. There is no evidence of any other similar conduct either before or after Anderson's state arrest. Although the fact that the alleged actions seem to be limited to MV and he no longer lives with Anderson limits the Court's concern for Anderson's propensity for continued dangerousness if released, it does not completely relieve it. The evidence suggests Anderson is undeterred by her charges and court orders and has repeatedly attempted to contact MV. And members of her family have made this communication possible. In short, Anderson still has access to children, her own and others, and has demonstrated that she does not fear violating court orders to reach them.

Most importantly, Anderson is quite clearly not interested in following bond conditions. Rather, she seems to prefer enjoying dinners and hangouts with friends

and galivanting about the Commonwealth. The electronic monitoring reports are limited to a period since August 2025, thus, there is no way for this Court to determine if Anderson was compliant up until then. Furthermore, Anderson's violations seemed to ramp up in recent months, with frequent visits to Warta's residence. Anderson's lackadaisical approach to following court conditions is not limited to those of her state bond release. As previously stated, she also has failed to follow a court order forbidding contact with her three children, including the minor victim. This extensive history of failing to comply with court-imposed conditions is very concerning to this Court, and the violation of such conditions demonstrates her apparent lack of concern for the criminality of her actions.

In sum, the BRA factors overwhelmingly support a finding that Anderson presents a substantial danger to the community and strongly favor detention. Furthermore, the Court seriously doubts the availability of conditions that will adequately guard against any danger that Anderson presents. Anderson previously spent over four years on the strictest version of state release available: home incarceration. Still, this did not encourage Anderson to comply. And it did not prevent her from contacting the minor victim in this case. But, most importantly, Anderson's actions involve a threat to the safety of society's most vulnerable group: children. Sex offenses involving children "are extremely dangerous to the community, particularly because such activities are often hidden from a defendant's closest friends and family members." *United States v. Tang*, No. 3:19-CR-00014, 2019 WL

Page **23** of **24**

2453655, at *4 (E.D. Ky. June 12, 2019).  There is simply no failsafe way to ensure the community's safety in the event of Anderson's release.

## D.   ANDERSON'S RISK OF NONAPPEARANCE

The United States did not make substantial arguments regarding Anderson's risk of nonappearance.  Thus, the government did not meet the preponderance burden to detain Anderson based on a risk of nonappearance and non-appearance-based detention is not proper under the BRA.

## II.   CONCLUSION

For the above-stated reasons, the Court finds the United States failed to prove by a preponderance of the evidence that Anderson poses a risk of nonappearance but proved by clear and convincing evidence that Anderson is an irremediable danger to the community and the Bail Reform Act mandates detention.

The Court has assessed the record, contemplated the risks, evaluated the conditions, and determined that no conditions exist that can reasonably assure Anderson will not pose a danger to another or the community.  Accordingly, the Court **GRANTS** the United States' oral motion for detention and **DETAINS** Defendant Anderson.

Signed this the 19th of March, 2026.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY